## CIRCUIT COURT OF BALTIMORE CITY.

Filed December 7, 1908.

---

HARRY FAHNESTOCK ET AL., TRUSTEES, VS. URSULÆ BROOKS ET AL.

---

*W. Burns Trundle* for the trustees.

*Bernard M. Carter, Charles McH. Howard, W. Hall Harris, Edward N. Rich, Joseph R. Gunther, James H. Preston* for other parties in interest.

HEUISLER, J.—

Under the provisions of the fifth clause of the last will and testament of Chauncey Brooks, deceased, it was directed that on the death of the survivor of his sons, the trustees named in the said will, or their successors in the trust, should *divide* the whole of the rest, residue and remainder of his estate, real, personal and mixed, and all accumulations thereto and investments thereof, equally among his grandchildren then living and the issue per stirpes then living of any deceased grandchild.

By proper proceedings in the above entitled case, the now acting trustees under said will have divided and distributed a large portion of the said residuary estate, but there yet remains undivided in their charge a valuable tract of land situated at the intersection of Eutaw Place and the lake drive in Druid Hill Park in Baltimore City, and known as "Cloverdale."

This particular lot was offered for sale at public auction by the trustees, and was withdrawn for want of a satisfactory bid, and a private offer of purchase was, also, for the same reason, declined by them. The tract is a large one containing nearly twenty-nine acres of land, but is rough and undeveloped, and its topography is uneven, shading off from a point near the middle thereof, of about fifteen feet above the pres-

ent city street level to declivities and gullies, particularly on the eastern boundary, much below the said street levels. It is located in a section of the city entirely used for residential purposes, and is only suitable for such purposes, and the present improvements of that character in the neighborhood are middle class, and in a few instances very handsome.

The trustees having, with good judgment, declined the public offers of purchase, now file their petition in this case, asking for the passage of an order authorizing them to expend the sum of $50,000, or so much thereof as may be necessary, for the development of a part of the whole tract, that part being designated in their petition as "lying between the east side of the alley east of the east side of Linden avenue, to be extended northwestwardly to Druid Hill Park and the east side of Eutaw Place;" and it is stated in their petition that, in the judgment of the trustees, it is not at this time either expedient or necessary to make development of the entire tract. There is also filed with the petition a carefully prepared estimate showing the cost (to use the words of the petition) "of extending Linden avenue northwestwardly to Druid Hill Park, and opening intersecting streets between Eutaw Place and Linden avenue, if extended, and of grading, paving and curbing the same, including both sides of Linden avenue and alley in rear thereof, and the cost for excavating streets and lot, curbs and gutters, macadam, parking, pavements, storm water drains and paving alleys."

The parties interested answered said petition, but only one of them fully approved the recommendation of the trustees, and by answer united in the prayer of the petition. The substantial position of the others answering may be stated thus: (1) The question of development had been the subject of many conferences between the parties interested, and numbers of plats and suggestions had been submitted, but not agreed upon; (2) that the opening up of streets and alleys through the property would destroy the now existing valuable improvements thereon; (3) that it was exceedingly doubtful whether it would be advantageous to develop at all, and that the property should be held until more favorable time, and opportunity for sale in its present shape should arise; (4) that the order requested by the trustees involved very complicated matters, interests and rights, a mistake concerning which would be far reaching and irremediable; (5) that assistance should be had from persons having experience in the development of real estate in the City of Baltimore; (6) that the property should be developed under the advice of the best and most skillful engineer that could be obtained, and that the work should be done by contract, according to full and proper specifications, by the lowest bidder after due advertisement. Testimony was essential for proper consideration of the petition in view of the above attitude assumed by the respondents interested, and the same was duly taken with the following results:

"Trustee's Exhibit (1908) A" filed with the petition, and known as the "Simonds plan," was submitted and recommended by the trustees as a most advantageous and desirable scheme of development, and as the plan most strongly appealing to them. This plan provides for the extension of Linden avenue through to Druid Hill Park parallel with Robert and Callow avenues. It also provides for the opening of three parallel streets at Eutaw Place, running east to Bolton avenue, the first of said streets to be known as "Cloverdale road," opening at Eutaw Place about one hundred and thirty (130) feet south of the lake front line of the whole tract, and running in the rear of said front with varying depth to the west side of Bolton avenue; and the others being south of said Cloverdale road at proper and convenient distances. This plan leaves on the lake front a number of large lots which were claimed by the trustees as having advantageous positions, because they commanded good views, were on the high ground of the tract and in immediate neighborhood of the expensive homes on the west side of Eutaw Place.

By the same plan it was contemplated that the south side of Cloverdale road could be improved on lots running back to an alley between that road and the street south thereof, and then improved on that street on lots running north to the said alley; and then on in like manner on the streets to the south in solid rows following the usual style of close building in the neighborhood;

thus putting on the market by the development more front feet.

With reference to the large lots fronting the lake, one of the trustees testifying says: "The plan adopted here is a little different from what has been adopted in that section before, but in Mr. Simonds' opinion, *in which we agreed*, we felt this might properly stand a better development, and if we adopted his plan we not only got more front feet, but we probably increased the value of that land by bringing a better class of house there, and I think, as far as my observation goes, that his judgment is correct."

The sweep of this lake front is about 800 feet and the "Simonds Plan" contemplated that the trustees were not to sell less than fifty front feet to a lot; that the houses were to be so constructed on these lots as to permit of the largest open space possible between them, so as to afford a view to the north of the houses to be built on the south side of Cloverdale road.

It also contemplated a distinct style of arrangement in these lake front houses; they were to have fronts both north and south with their kitchens in the middle of the buildings, and not in the rear, and that the buildings were to set back forty or fifty feet from the lake drive, and the lots to be terraced down to that drive, and that they were to be approached by driving only on Cloverdale road which was to be parked and macadamized.

The plan, in addition to the above features, contemplated that there should be restrictions in regard to the the use of the lake front lots, with a minimum limit for the cost of the houses; that there should be but one house on each lot and no stables. It also provided that the roadbeds of the streets should be a good quality of macadam with curbing, cement walks and planting along the parkways between the sidewalks and macadam, and other restrictions with reference to the care of the property, including assessments for maintenance, and suggesting that the same might be intrusted to a committee appointed by the owners.

These restrictions and requirements, according to the plan, should be reduced to covenants and agreements in the deeds of the various purchasers. The trustees, approving this plan, contended that these restrictions would be practical and not onerous, and that they existed in "locality after locality," and cited the case of Roland Park and other legal developments, and claimed that this character of restrictions would bring up the character of the land.

This plan of development was not distinctly urged or advocated in the petition filed by the trustees, although an outline print of the same was filed as an exhibit therewith, but in the testimony submitted by them, it is apparent that this is the plan they desire to use, and the one they approve, and its study and consideration is important for the purpose of ultimate action on the petition.

The trustees have given much time and thought to the subject, and have gone into the matter very thoroughly. There were submitted to them plats other than the one prepared by Mr. Simonds, and for the purposes of this examination they should now be mentioned. They are referred to in the evidence as the "Lindsay and Barker Plats," and "Defendants' Exhibit No. 1."

The distinctive difference between them and the "Simonds plat" is that they all propose a street or way along the lake front of the property with houses on the south side of said street or way running back to an alley. They do not contemplate any restricted style of building or improvements. The improvements, following these several plans of development, contemplate sales to purchasers in blocks for solid rows of buildings, that style being, with few exceptions, the custom of the neighborhood, with the exception of the lake front lots whose peculiarly advantageous location might be (without restrictions as set out in the other plat) very attractive for individual purchasers in the open market. Testimony was submitted on behalf of the respondents by three experienced and expert real estate men and builders, familiar with the real estate market in Baltimore City, and with personal experience in the development for sale of real estate in that city. The esthetic character of the "Simond's Plan" attracted them, but they agreed unanimously against it as a local business-like and practical development.

The proposition in the "Simonds' Plan" to lay out sixteen lots of fifty feet from each and facing on the lake,

598

and the sale of those lots with restrictions was discouraged by one of the witnesses as follows: "In this development, every man would have to develop it exactly the same way. Now you would have to have as purchasers sixteen men who would want the same kind of development. Now when you do this you destroy the possibility of making quick sales for your land, and practically take it out of the market."

These witnesses seemed to agree in substance that the development under the "Simonds' Plan" might commend itself to an individual developer where the question of time of return on investments was not a very material consideration, but as a development to divide an estate by the reasonably quick sales of the lots as laid out on the plan, it was not business-like and practical. They regarded it as a new and novel proposition—a distinct local departure in the handling and treatment of the subject; that it would be a trial and experiment.

The same opinion was given by one of the other trustees in these words: "It would look as though Baltimore ought to have a market for that character of improvements. *It might not immediately but certainly in the near future.*" This trustee, again replying to a direct question whether or not it would take a much longer time to sell the property if developed under the "Simonds' Plan" than under the other plans, because the other plans did not contemplate restrictions, parking and an organization of trustees to keep the streets and parking in order, frankly said, "in answer to this question, it would simply be an opinion from me or anybody else as to how long it would take to sell this property. As we have already stated, in our opinion, this is the best plan. This is the plan that would bring the best results; this is the plan that would bring the heirs the most money. I do not think anybody can be a judge of that; it will simply be a question of the market." Answering the petition, the respondents did not insist upon a development in accordance with the Lindsay and Barker, or any other plans; they contented themselves with objecting to and protesting the "Simonds' Plan," and asked for more light and information from the trustees and the witnesses.

One of their witnesses, after stating the objections which he felt towards the plan favored by the trustees, volunteered the following suggeston: "I do not think the question depends on the location of the Cloverdale road at all, I think that is a technical question. It may have some influence, but it is a slight one. It is only in the background. In my judgment, what is required in that property is to put thirty-five or forty thousand yards of earth and fill it up. The property is in bad shape, and has been for years. It is a dumping ground, and you will not be able to get a builder, nor do I think you will be able to get many individual buyers, who will buy on Eutaw Place or on the park front as long as that dump is there. I venture to say, and I can prove it, if you gentlemen desire, that for every dollar you spend in filling up that land you will get ten dollars in return. You want to put that ground in shape; you want to fill it, that is the first thing. * * * The great beauty of that property is its elevation; if you keep it down in a hole you destroy that effect. You want to fill and bring that land up. * * * There may be a little grading necessary. Grade the streets and fill them accordingly. When you do that you make your land presentable and merchantable." This statement may furnish the key to the situation.

The statement may also be considered with reference to the following question and answer in the evidence: (Mr. Preston) "Mr. Caughy, there are two ways of developing this property, one is by an elaborate system of development, parking, and so forth, and the other is by putting up a commercial development, similar to the property—on general lines—similar to the property in the neighborhood. Which do you think of these two plans, will produce the most money for the estate?" (Mr. Caughy) "I do not think there is a doubt in the world, because you can dispose of that property under the latter conditions much more rapidly than you could by putting up the value on it."

The testimony submitted in this matter is quite voluminous, and it has been carefully and critically examined. It has been the desire of the court to treat this question in a liberal way. Modern and elaborate developments of

property which promise to adorn and beautify the city, must strongly appeal to the civic pride, and if justified by the facts and the law which must control the conduct of the trustees, they will receive the approval and sanction of the courts. Jurisdiction in this case has been assumed by this court.

The acting trustees under the last will and testament of Chauncey Brooks are charged with the duty of *dividing* the residuary estate as in said will set out. Their trust is unfulfilled until they, themselves, divide it. As in the case of Dodson vs. Ashley, 101 Md. 515, "they have not a mere naked power. They have the power in connection with, and as appendant to the legal estate with which they are vested, and of which they will not be divested until the purposes of the trust have been fulfilled." As in that case their "testator left a considerable estate * * * all of this estate he placed in the hands of persons, to care for, manage and control for the best interests of the beneficiaries thereof; and then at a time, indicated by him, to divide the property. He did not direct that the property should be turned over to be divided; nor indicate that any other agency was to be invoked in making the division. The express direction is that the trustees are themselves to divide it. He commits this to their skill and judgment and it is their *discretion* that is to guide them in carrying out this direction. It is as much a part of the trust, therefore, for the trustees to divide the property as directed and transfer and deliver the several shares as directed, as it was for them to hold and manage it." This discretion thus reposed in trustees is, however, "not a mere arbitrary discretion, but a discretion coupled with a trust, and to be exercised solely for the benefit of the *cestuis que trust*."

The duty of the trustees in making a sale, and necessarily in developing for the ultimate purposes of a sale, is to act in a *prudent* and *businesslike* manner. If the trustees adopt an injudicious and disadvantageous mode of selling trust property, a court of equity ought not ratify the sale. The property must be offered, and necessarily developed for offering, in the most advantageous manner. Gould vs. Chappell, 42 Md. 466; Carroll vs. Hutton, 88 Md. 680; Thomas vs. Fewster, 95 Md. 446.

The "Simonds' Plan" approved by the trustees, and in the development of which the large sum of money asked for in the petition would be expended, does not commend itself to the court as that *prudent and businesslike* action required by the law on the part of the trustees, and in the light of the testimony given, its adoption would be an injudicious and disadvantageous mode of developing the property for ultimate sale and division.

Entertaining these views an order will be signed refusing the prayer of the said petition as filed but retaining same for further action of the court.